# EXHIBIT 1

# EXHIBIT 1

**reviewjournal**.com



Powered by  Clickability

  Click to Print

SAVE THIS | EMAIL THIS | Close

Jul. 12, 2010
Copyright © Las Vegas Review-Journal

# SUMMERLIN COSTCO STORE: Slaying of Army veteran shocks friends

## Man shot by police was West Point grad

By LAWRENCE MOWER
©2010 LAS VEGAS REVIEW-JOURNAL

The man shot by police outside a Summerlin Costco store on Saturday was a graduate of the U.S. Military Academy at West Point with a master's degree from Duke University, friends said.

Army veteran Erik Scott, 39, was at the store near Charleston Boulevard and the Las Vegas Beltway with his girlfriend before three officers fatally shot him in a confrontation.

Friends and an attorney speaking on behalf of Scott's relatives, described him as a good man from a military family. His father was in the Air Force, and his grandfather fought in World War II, friend Mike Pusateri said.

"The most loyal, honest, trustworthy, salt-of-the-earth guy you could meet," said Pusateri, 38. "You only meet one or two of those kinds of guys in your life, and Erik is one of them."

Scott worked for Boston Scientific, a medical devices manufacturer, as a sales representative for the company's pacemakers. Attorney Ross Goodman, who represents Scott's family, said Scott was one of the company's top sales employees.

Pusateri and Goodman said Scott and his girlfriend were at the Costco because they were moving in together and wanted to buy the things they needed. The two men declined to discuss the events that led to the shooting.

According to Las Vegas police, officers were called to 801 S. Pavilion Center Drive at 12:47 p.m. by a store worker who said a man was destroying merchandise. Police were told the man had a gun.

Capt. Patrick Neville described Scott as "kind of going berserk." Workers evacuated the store. Officers stopped Scott outside as the customers were leaving.

Neville said an officer tapped the man on the shoulder and identified himself as police. Scott then spun around and reached for a gun, law enforcement officials said.

"They ordered him to the ground," Neville said of the officers on Saturday. "He does not comply with that order. He reaches for the weapon, pulls the weapon out, at which time, the weapon was out of the waistband."

Three officers fired multiple times, killing Scott.

One witness interviewed Saturday and three others interviewed Sunday by the Review-Journal

gave accounts that differed from what police described.

With a few minor variations, the witnesses recounted matching sequences of events. The witnesses interviewed did not see what happened inside the store that prompted workers to call police. Three of the witnesses, upset by the event, asked that their names not be published.

Once Scott was outside, none of the witnesses saw him brandish a weapon or make any movement that would seem like he was brandishing a weapon.

The first witness already had made his purchases and was waiting in line for a worker to check his receipt when he saw an officer enter the store. The officer whispered something to the worker checking the receipts. The first witness then heard that employee turn to another employee and say, "He said we should let him through."

The four witnesses described a calm rush of customers exiting the front of the store after Costco workers told everyone to leave.

Attorney David Amesbury said he arrived in time to see shoppers leaving. He described the customer exodus as being "like the aftermath of Disneyland."

A customer told Amesbury that he couldn't go in, so the attorney waited on a bench west of the entrance. He said he had a clear view of two officers standing beside the entrance with their guns drawn.

All four witnesses said they were within 20 feet of the store's main entrance. They said Scott walked out of the entrance with the crowd.

They described an officer shouting at Scott, then a quick succession of gunshots.

The witnesses differed in their recollection of what one of the officers said.

Amesbury heard, "I told you to stop. Stop."

Two witnesses interviewed Sunday heard, "Drop it."

A fourth witness, interviewed Saturday, heard, "Get down," "Put it down," or "Get out of the way."

A second anonymous witness said Sunday he saw Scott pull up his shirt and turn toward the shouting officer. Then he saw the man get shot, drop to his knees and fall face-first in front of the entrance.

"There wasn't even time for someone to react," the second witness said. "The guy didn't pull a gun. There was no gun in his hand, there was no gun on the ground."

The second witness said he was interviewed by homicide detectives and gave them the same account.

The first anonymous witness also didn't see Scott make a threat.

"I certainly did not see the guy do anything with a gun that would threaten anybody," the first witness said Sunday. "It appeared to me that if he had guns on him, that they were literally in his pocket or in his waist."

The first witness also was interviewed by homicide detectives about the shooting.

Amesbury said he did not see the man get shot, but, "When I go around the corner, I see this guy laid out. I didn't see a gun." Amesbury's view of the shooting was blocked by stone pillars. He was not interviewed by police.

Before the shooting, Scott was walking with a woman that three witnesses thought was his girlfriend. They said she became distraught after the shooting. The incident also left the witnesses shaken.

It's just incredible "with all these people around that Metro would provoke something there," the second witness said. "I don't want to second-guess the police, but wouldn't it have been better to confront him out at his car?"

After the shooting, some people in the crowd panicked. An elderly woman was knocked down and cut her elbow in the chaos, the second witness said.

Only Scott was struck by gunfire .

Police said Scott had two handguns on him when he was shot. Goodman said Scott had a concealed-weapons permit.

Pusateri said his friend was a "safety freak" around guns. He said that "absolutely not in a million years" would Scott be careless with them around others.

Scott graduated from West Point, in New York, in 1994 and was stationed for a time at Fort Hood, Texas, as a tank platoon leader. In 2003, he graduated from Duke University in North Carolina with a master's degree in business administration.

Friends said they noticed nothing strange about Scott in the days before the shooting.

On Friday, Scott's vehicle was struck by another vehicle while he was rushing a pacemaker to Summerlin Hospital Medical Center, Pusateri said. Scott was not injured in the collision, and a firefighter took the device from the crash scene to the hospital, he said.

Friends were distraught and puzzled as to why police shot and killed Scott.

"He's a stand-up guy in the community," Goodman said. "This guy is not somebody to put himself in a situation like that."

Pusateri, who also sells medical devices, said Scott worked closely with patients in his job. He called Scott's job the "pinnacle" of the business.

"It's very, very sad," Pusateri said. "I'm shocked by it. It's the tragic loss of a great man."

Contact reporter Lawrence Mower at lmower@reviewjournal.com or 702-383-0440.

**Find this article at:**
http://www.lvrj.com/news/slaying-of-army-veteran-shocks-friends-98223884.html

 Click to Print

☐  Check the box to include the list of links referenced in the article.

SAVE THIS | EMAIL THIS | Close

Copyright © Las Vegas Review-Journal, 1997 - 2008

Go Green! Subscribe to the electronic Edition at www.reviewjournal.com/ee/

# EXHIBIT 2

# EXHIBIT 2

< VA-ALERT: Victory in York County! | VA-ALERT: VCDL Update 7/21/10 - Part 2 >

## Thursday, July 22. 2010

# VA-ALERT: VCDL UPDATE 7/21/10 - PART 3

*From Philip Van Cleave*

*Table of Contents*

--------------------------------------------------------------------
VCDL's meeting schedule:  http://www.vcdl.org/meetings.html
--------------------------------------------------------------------
Abbreviations used in VA-ALERT:  http://www.vcdl.org/help/abbr.html
--------------------------------------------------------------------

25. Applications for concealed-gun permits from Utah hit record levels
26. Utah's gun permit popular with nonresidents
27. Judge blasts Iowa sheriff for denying gun permit to man considered 'weird'
28. Thomas' principled jurisprudence in arms case
29. Vendor (not customers) has a negligent discharge at a gun show
30. Time Magazine web site photos on OC
31. Police shoot Army veteran at Las Vegas Costco
32. How the McDonald decision shows that activism works
33. Why liberals should love the Second Amendment
34. Tell me again how taking away all our guns would make us safe

*Click here to start receiving VA-ALERTS in your email.*

*Click the Continue Reading link below to read this VA-ALERT in its entirety.*

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
25. Applications for concealed-gun permits from Utah hit record levels
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Roy Scherer emailed me this:


From: www.washingtonpost.com:    http://tinyurl.com/25xvdzt


Applications for concealed-gun permits from Utah hit record levels
By Reuters
Tuesday, July 6, 2010

Never shot a gun? Never been to Utah? You could still qualify for a concealed-gun permit from the state.

The Beehive State is experiencing record demand for permits from across the United States, particularly with the rise of the "tea party" movement, which advocates small government and individual rights. The move has also been spurred by fears that President Obama will seek to enact national gun control.

Utah makes it easy to get a concealed-weapons permit, which is valid in 32 other states and lasts five years.

Today, more out-of-state residents than state residents have Utah permits, and out-of-state instructors outnumber those from Utah.

Applicants must clear a background check, be 21, take a course and pay a $65.25 fee. Last year, 74,000 people applied for the permit.

The program alarms gun-control groups such as the Brady Campaign to Prevent Gun Violence.

"It's a state where they don't seem to care about the consequences that may arise from some of the permits they're issuing," spokesman Peter Hamm said.

Officials with the Utah Bureau of Criminal Identification said they are overwhelmed.

"The only people making money off it are the instructors," said Lt. Doug Anderson, manager of the concealed-firearms program.

Not all states are happy with Utah's plan. New Mexico and Nevada have revoked recognition of Utah's licenses in recent months because that state does not require applicants to train with a handgun or even fire one.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
26. Utah's gun permit popular with nonresidents
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

From: www.nytimes.com:    http://tinyurl.com/27nqpsd


July 5, 2010
Utah's Gun Permit Popular With Nonresidents
By DAN FROSCH

James Roe, a 64-year-old computer consultant from rural Pennsylvania, spent a recent Saturday in a Pittsburgh suburb learning about riflings, hangfires and powder charges. The gun safety class was for people seeking a concealed-firearm permit in Utah, some 1,500 miles away. Never mind that Mr. Roe has not been to Utah in 20 years and has no plans to visit anytime soon.

Like thousands of other gun owners who will most likely never set foot in Utah, Mr. Roe wants a permit there for one reason: It allows him to carry his semiautomatic .45-caliber pistol in 32 other states that recognize or have formal reciprocity with Utah's gun regulations.

"I think that all states should be as broad based with reciprocity and as careful as the state of Utah is," said Mr. Roe, who wants the option of taking his handgun with him when he visits his son in Ohio, both for protection and for target practice. (Ohio does not honor Pennsylvania's firearm permit.)

With the Supreme Court ruling last week that the Second Amendment's guarantee of an individual's right to bear arms applies to state and local laws, Utah is a popular player in Americans' efforts to legally obtain firearms. The state is issuing what has become the permit of choice for many gun owners.

Fifteen years after the Utah Legislature loosened rules on concealed firearm permits by waiving residency and other requirements, the state is increasingly attracting firearm owners from throughout the country. Nearly half of the 241,811 permits granted by the state are now held by nonresidents, according to the Utah Bureau of Criminal Identification, which administers the permits.

In 2004, Utah received about 8,000 applications for the permits. Last year, 73,925 applications were submitted -- with nearly 60 percent coming from nonresidents.

Laws for carrying concealed firearms vary widely by state, as do issuing standards for permits. New York, New Jersey and Connecticut do not honor other states' permits. Some states, like Florida, allow nonresidents to qualify for permits. Utah stands out because its permit is relatively inexpensive and is broadly accepted, and the requisite safety class can be taken anywhere.

By passing the class and the background check, and paying a $65.25 fee, the applicant receives what many consider to be the most prized gun permit in the country. Permits are good for five years and cost $10 to renew.

Some Second Amendment proponents argue that people with permits are more likely to be law abiding because they have undergone at least some form of background check.

"The spirit of self-defense should not stop at a state's border," said Clark Aposhian, a Utah gun lobbyist who sits on the state's Concealed Firearm Review Board, which helps regulate the permitting process. "Not once has there been a pattern of problems with Utah permit holders in other states."

But Utah's permit program has its critics. Peter Hamm, a spokesman for the Brady Campaign to Prevent Gun Violence, asserted that Utah's policy was dangerous because many states were lax in submitting felony and mental health records to the federal database used for background checks.

"I think it's absolutely shameful and ludicrously irresponsible to say that anybody anywhere who wants one of our concealed-carry permits, and thus will be able to carry legally in dozens of states, can just log on to our Web site and pay 60 bucks and that's all she wrote," Mr. Hamm said.

As more people have turned to Utah for permits, the demand for instructors who teach Utah's gun safety class in other states has increased. Of the 1,097 instructors certified by Utah, 706 are in other states. Advertisements for classes held throughout the country appear widely on the Internet.

Another source of contention is that the class does not require any actual shooting. One could conceivably obtain a Utah permit without ever having fired a gun. Nevada and New Mexico recently stopped honoring Utah permits because the class does not meet its live-fire requirements.

"Residents of other states should be aware that people who have a Utah concealed-weapon permit may not have actually fired a weapon," said Dee Rowland, chairwoman of the Gun Violence Prevention Center of Utah. "I think that would be quite shocking to members of the public."

Supporters of Utah's policy counter that the state's 50-page curriculum on gun safety, and background checks that are updated every 24 hours, ensure that the system is safe.

"We teach passive defense in Utah," said State Representative Curtis Oda, a Republican from Clearfield.

"We have no idea what could have happened had there been an armed defender at Columbine and Virginia Tech," Mr. Oda said, "but we know with absolute certainty what happens when there's not."

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
27. Judge blasts Iowa sheriff for denying gun permit to man considered 'weird'
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

A judge requires that a sheriff tissue a CHP previously denied and to also take a course on U.S. Constitution!

From: blogs.desmoinesregister.com:    http://tinyurl.com/26xaxkm

Judge blasts Iowa sheriff for denying gun permit to man considered 'weird'

A federal judge has strongly chided an Iowa sheriff for denying a gun permit to a government watchdog and

anti-abortion advocate who some community members considered "weird."

It was wrong for Osceola County Sheriff Douglas Weber to deny Paul Dorr, an Ocheyedan father of 11 home-schooled children, a permit that would allow him to carry a concealed weapon, according to a court opinion issued Wednesday.

"The court finds a tsunami, a maelstrom, an avalanche, of direct, uncontroverted evidence in Sheriff Weber's own testimony to conclude beyond all doubt that he unquestionably violated the First Amendment rights of ... Paul Dorr," wrote U.S. District Court Judge Mark W. Bennett of the Northern District of Iowa.

The judge continued: "This is a great reminder that the First Amendment protects the sole individual who may be a gadfly, kook, weirdo, nut job, whacko, and spook, with the same force of protection as folks with more majoritarian and popular views."

The Dorr case, filed in October 2008, inspired some grassroots activists to push for changes in the state law that gives Iowa sheriff's almost unlimited discretion to deny weapons permits.

After intense lobbying from Iowa gun rights advocates and the National Rifle Association, state lawmakers earlier this year approved legislation that spells out a narrow list of reasons why a sheriff can deny a permit. The new law takes effect Jan. 1, 2011.

In his ruling Wednesday, Bennett ordered the Osceola County sheriff to immediately issue Dorr a nonprofessional permit to carry a weapon.

The judge also ordered Weber to successfully complete a court-approved course on the United States Constitution within the next five months.

"In denying (Dorr) a concealed weapons permit, Sheriff Weber single-handedly hijacked the First Amendment and nullified its freedoms and protections," Bennett wrote.

Weber, a Republican who has been either a deputy or a sheriff in Osceola County since 1979, has long known the Dorr family, court documents state.

"Through the years, Sheriff Weber heard comments about (Dorr) which related to him being 'weird,'" court documents state. Weber also believed there were people in the county who were afraid of him.

Dorr has been arrested and convicted multiple times for a variety of non-violent offenses connected with protests at abortion clinics - such as blocking doors and praying, court records state.

His anti-abortion activities with a group called Rescue the Perishing stretched into South Dakota, Nebraska, Minnesota, Georgia and Virginia, records show.

Dorr has also written letters to the editors of newspapers and distributed flyers.

In spring 2007, Dorr made an open records request for information on the compensation and duties of the deputies in the Osceola County Sheriff's Office.

He received the sheriff's policy and procedure manual, but he was "also provided with a large bill for the copies," the judge stated.

Dorr was billed for 90 minutes of photocopying, plus a fee of 10 cents per page for more than 200 pages of documents, court records state.

Dorr successfully obtained a gun permit from the late 1990s to 2006. Weber was sheriff for two of those years.

But in July 2007, Weber turned him down. Weber wrote on the denied application: "Concern from Public. Don't trust him."

Weber testified that after Dorr began to work with a group that challenged the county budget: "People started talking about it saying things like, 'Oh, that guy's a nut job. Oh, that guy's whacko.'"

Dorr said he applied for the ability to carry a weapon because he supplemented his income by selling balloons along a parade route in Sioux City. This required him or his relatives to carry as much as $1,500 in cash in fanny packs.

In 2008, one of Dorr's sons, Alexander, applied for a permit, saying he helped with the balloon business and had gotten death threats connected to his family's anti-abortion advocacy. Weber denied the son's permit and informed Dorr that he would deny any further applications from him.

Both Alexander and Paul Dorr believed Weber's denials of their applications were the result of their advocacy against county spending, court testimony shows.

The judge agreed.

"Dorr was denied a permit precisely because Sheriff Weber believed that his free speech rights offended the majority of voters in Osceola County," Bennett wrote in his ruling.

Dorr's son, Alexander, also sued, but Bennett ruled Wednesday that Weber didn't retaliate against Alexander Dorr for exercising his First Amendment rights to free speech.

Both Dorrs waived their claims to punitive damages.

--------

Mike Soh emailed me this:

--

Hey Philip,

I don't know if you got wind of this article but it goes to show that the second amendment protects the first amendment.  Case in point, Paul Dorr was denied a permit because he was "protesting, passing out leaflets and writing letters to the editor" about the sheriff.  The court ordered the Sheriff to issue him the permit and, here's the kicker, ordered him to attend a college level course about the Constitution.

Now only if we could force all of the politicians to do the same...

From: www.siouxcityjournal.com:    http://tinyurl.com/256cmev

HE REQUIRES SHERIFF TO TAKE FIRST AMENDMENT COURSE
Federal judge orders Osceola County sheriff to issue gun permit
By Russ Oechslin - Journal correspondent | Posted: Thursday, July 8, 2010 6:00 am

PRIMGHAR, Iowa -- U.S. District Court Judge Mark W. Bennett has ordered Osceola County Sheriff Douglas L. Weber to issue a gun permit to a resident and to complete a college-level course involving the First Amendment.

Bennett's written decision on Wednesday involves the case of Paul Dorr, of Ocheyedan, who was denied a permit to carry a concealed weapon.

Dorr and his son, Alexander, were denied gun permits after being engaged in extensive First Amendment activity -- protesting, passing out leaflets and writing letters to the editor -- the opinion notes.

"The court finds a tsunami, a maelstrom, an avalanche, of direct, uncontroverted evidence in Sheriff Weber's own testimony to conclude beyond all doubt that he unquestionably violated the First Amendment rights of at least Paul Dorr," Bennett wrote in his ruling.

Dorr said Wednesday that he was pleased "justice is served. I get my permit back and the sheriff is being sent back to school. The harm done by Sheriff Weber against the 6th and 9th commandments has been made right."

The elder Dorr had been issued a concealed weapons permit from the late 1990s to 2005. But his July 7, 2007, application for a permit was denied. His son's was denied a year later, when he was 18 years old.

Weber's reason for disapproving the application was, "concern from public. Don't trust him." The following year Weber also denied Alexander Dorr's application for a permit and informed Paul Dorr that he would deny any further applications from him.

Weber testified that he had heard people refer to Paul as "a whacko, delusional, a nut job, a spook, and narcissist," Bennett's decision noted. "Regardless of the adjective used to describe Paul, however, Sheriff Weber stated that Paul's 'lousy' reputation was due to his political activities of writing letters to the editor and distributing fliers."

The ruling continued, "Giving Sheriff Weber more deference than is due his elected status, the court finds that Sheriff Weber denied Paul's application for a concealed weapons permit not because of the content of his First Amendment activity but because it was effective and agitated many members of the local community."

And, Bennett said, "In denying Paul a concealed weapons permit, Sheriff Weber single-handedly hijacked the First Amendment and nullified its freedoms and protections. Ironically, Sheriff Weber, sworn to uphold the Constitution, in fact retaliated against a citizen of his county who used this important freedom of speech and association precisely in the manner envisioned by the founding members of our nation ...
"In doing so, this popularly elected Sheriff, who appears to be a fine man and an excellent law enforcement officer, in all other regards, blatantly caved in to public pressure and opinion and, in doing so, severely trampled the Constitution and Paul's First Amendment rights to freedom of speech and association. This is a great reminder that the First Amendment protects the sole individual who may be a gadfly, kook, weirdo, nut job, whacko, and spook, with the same force of protection as folks with more majoritarian and popular views."

However, Bennett's decision did not favor Dorr's son, who was 18 years old when he applied for the carry permit, and is 20 now. Bennett noted that sheriffs have the discretion to withhold permits from anyone under majority age.

Bennett required Weber take a class that must be a college-level course on the United States Constitution, "including -- at least in part -- a discussion of the First Amendment." And Bennet said, Weber must obtain approval from the court before participating in the class. Upon completion of the class, Weber must also file anan affidavit with the clerk of court showing successful completion with a passing grade.

A request left with the dispatcher at the Osceola County law enforcement center, requesting a return call for comment from Sheriff Weber, was not returned, Wednesday night.

**************************************************
28. Thomas' principled jurisprudence in arms case
**************************************************

Vincent Miragliotta emailed me this:


From: www.washingtonexaminer.com:    http://tinyurl.com/2a6zcrh


Thomas' principled jurisprudence in arms case
By: Michael Barone
Senior Political Analyst
July 7, 2010

In 1978, Justice Lewis Powell wrote an opinion in the Bakke case asserting that the need for diversity could justify racial preferences in university admissions. No other justice joined this opinion, but because the other justices were split 4-4, Powell's opinion decided the case, and in time his argument has been embraced by a majority of the court. A regrettable result, in my view, but a consequential one.

Last month Justice Clarence Thomas delivered a similarly decisive opinion in McDonald v. Chicago, the case holding that the Second Amendment's right to keep and bear arms, recognized by the court in 2008 as applying to the federal government, also limits the power of the states.
The other eight justices argued whether that right was fundamental enough to apply to the states under the 14th Amendment's guarantee of "due process of law." Since the 1940s the justices have been arguing whether various federal rights were fundamental enough to apply to the states under this clause. In McDonald, four justices argued that the Second Amendment was fundamental to the states, and four disagreed.

Thomas, writing separately, declined to apply the due process clause. Rather he argued that the Second Amendment applied to the states because the right to keep and bear arms under the 14th Amendment's command that "no state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States."

Legal scholars have generally considered that the Supreme Court's decision in 1873 in the Slaughter-House Cases rendered the privileges and immunities clause a nullity. Thomas, who has regularly declined to follow precedent he considers incorrect, argued persuasively that the 1873 case was incorrectly decided.

Certainly it is not a precedent that is an ornament of the law. As Thomas pointed out, the 14th Amendment was passed in 1868 to guarantee the rights of the newly freed slaves. The Slaughter-House Cases undercut that purpose and made possible the violent subjugation of American blacks that is one of the most regrettable episodes of our history.

And, as Thomas argues in vivid detail, one of the key rights black Americans were deprived of was the right to keep and bear arms. The wisdom of the Founders' inclusion of the Second Amendment in the Bill of Rights is clear from the efforts black Americans made to exercise that right and from the efforts of white racists to deprive them of it.

For many years "the educated class" has denigrated the Second Amendment and argued that it was outmoded and only concerned national guards. But legal scholars, liberal as well as conservative, demonstrated that the Framers fully intended to protect citizens' rights to arm and protect themselves.

At the same time, empirical evidence has made it clear that gun control laws infringing that right left law-abiding citizens at the mercy of criminals. And empirical evidence in the 40 states that now allow law-abiding citizens to carry concealed weapons has demonstrated that they could be trusted to exercise that right responsibly.

The only alarming thing about the McDonald decision was that it was decided by only a 5-4 margin and could conceivably be reversed later by the court. As a practical matter it allows reasonable restrictions on firearms while eliminating laws that attempt, futilely, to ban them altogether.

Thomas' colleagues, like many legal scholars, were evidently unwilling to join him in overturning the Slaughter-House Cases and based their decisions on the privileges and immunities clause, presumably because that might undercut other precedents.

But Thomas, in my view, has the better logical argument. "The notion," he writes, "that a constitutional provision that guarantees only 'process' before a person is deprived of life, liberty or property could define the substance of those rights strains credulity for even the most casual user of words."

As he points out, the court has used the due process clause to find rights -- notably the right to an abortion -- that are not specified in the Constitution, while at the same time four current justices have also used it to argue that a right specified in the Second Amendment does not apply to the states.

Thomas' concurring opinion points the way to a more principled jurisprudence, based more clearly on the text of the Constitution, while at the same time making the strongest of possible cases that Second Amendment rights are fundamental.

```
**************************************************
```
29. Vendor (not customers) has a negligent discharge at a gun show
```
**************************************************
```

Never, ever, assume that a gun is unloaded - always, always check it!

From: www.orlandosentinel.com:    http://tinyurl.com/2cyebj7


Two vendors injured when firearm discharges at Florida Gun Show
Amy L. Edwards, Orlando Sentinel
5:39 p.m. EDT, July 6, 2010

Two vendors at the Florida Gun Show were injured over the weekend by another vendor who fired a shot into the concrete floor, Orlando police reported today.

Neither man was seriously hurt, nor struck directly by the bullet.

According to the incident report, an Orlando police officer who was working off-duty at the gun show Saturday heard a gunshot about 100 feet from where he was walking about 1:40 p.m.

He then saw two men, identified as Mark Morrison of Cape Canaveral and Robert Earle of Longwood, bleeding, the report said.

Morrison and Earle were vendors with Jack Jenkins of Brandon, who told Orlando police he was looking at a Colt .45 semi-automatic handgun and noticed the hammer was cocked back.

A police report said Jenkins told officers he directed the muzzle toward the floor and pulled the trigger without ensuring the firearm was clear and safe.

The firearm then discharged.

Morrison suffered a laceration to the top of his left foot and Earle suffered a laceration to his left shin area. Both men were taken to area hospitals and treated.

```
**************************************************
```
30. Time Magazine web site photos on OC
```
**************************************************
```

From: forum.opencarry.org:    http://tinyurl.com/28qlsb2


```
**************************************************
```
31. Police shoot Army veteran at Las Vegas Costco
```
**************************************************
```

Howard Roland emailed me this:

--

From:www.lvrj.com:    http://tinyurl.com/396oe73

SUMMERLIN COSTCO STORE: Slaying of Army veteran shocks friends

Man shot by police was West Point grad

By LAWRENCE MOWER
Jul. 12, 2010

The man shot by police outside a Summerlin Costco store on Saturday was a graduate of the U.S. Military Academy at West Point with a master's degree from Duke University, friends said.

Army veteran Erik Scott, 39, was at the store near Charleston Boulevard and the Las Vegas Beltway with his girlfriend before three officers fatally shot him in a confrontation.

Friends and an attorney speaking on behalf of Scott's relatives, described him as a good man from a military family. His father was in the Air Force, and his grandfather fought in World War II, friend Mike Pusateri said.

"The most loyal, honest, trustworthy, salt-of-the-earth guy you could meet," said Pusateri, 38. "You only meet one or two of those kinds of guys in your life, and Erik is one of them."

Scott worked for Boston Scientific, a medical devices manufacturer, as a sales representative for the company's pacemakers. Attorney Ross Goodman, who represents Scott's family, said Scott was one of the company's top sales employees.

Pusateri and Goodman said Scott and his girlfriend were at the Costco because they were moving in together and wanted to buy the things they needed. The two men declined to discuss the events that led to the shooting.

According to Las Vegas police, officers were called to 801 S. Pavilion Center Drive at 12:47 p.m. by a store worker who said a man was destroying merchandise. Police were told the man had a gun.

Capt. Patrick Neville described Scott as "kind of going berserk." Workers evacuated the store. Officers stopped Scott outside as the customers were leaving.

Neville said an officer tapped the man on the shoulder and identified himself as police. Scott then spun around and reached for a gun, law enforcement officials said.

"They ordered him to the ground," Neville said of the officers on Saturday. "He does not comply with that order. He reaches for the weapon, pulls the weapon out, at which time, the weapon was out of the waistband."

Three officers fired multiple times, killing Scott.

One witness interviewed Saturday and three others interviewed Sunday by the Review-Journal gave accounts that differed from what police described.

With a few minor variations, the witnesses recounted matching sequences of events. The witnesses interviewed did not see what happened inside the store that prompted workers to call police. Three of the witnesses, upset by the event, asked that their names not be published.

Once Scott was outside, none of the witnesses saw him brandish a weapon or make any movement that would seem like he was brandishing a weapon.

The first witness already had made his purchases and was waiting in line for a worker to check his receipt when he saw an officer enter the store. The officer whispered something to the worker checking the receipts. The first witness then heard that employee turn to another employee and say, "He said we should let him through."

The four witnesses described a calm rush of customers exiting the front of the store after Costco workers told everyone to leave.

Attorney David Amesbury said he arrived in time to see shoppers leaving. He described the customer exodus as being "like the aftermath of Disneyland."

A customer told Amesbury that he couldn't go in, so the attorney waited on a bench west of the entrance. He said he had a clear view of two officers standing beside the entrance with their guns drawn.

All four witnesses said they were within 20 feet of the store's main entrance. They said Scott walked out of the entrance with the crowd.

They described an officer shouting at Scott, then a quick succession of gunshots.

The witnesses differed in their recollection of what one of the officers said.

Amesbury heard, "I told you to stop. Stop."

Two witnesses interviewed Sunday heard, "Drop it."

A fourth witness, interviewed Saturday, heard, "Get down," "Put it down," or "Get out of the way."

A second anonymous witness said Sunday he saw Scott pull up his shirt and turn toward the shouting officer. Then he saw the man get shot, drop to his knees and fall face-first in front of the entrance.

"There wasn't even time for someone to react," the second witness said. "The guy didn't pull a gun. There was no gun in his hand, there was no gun on the ground."

The second witness said he was interviewed by homicide detectives and gave them the same account.

The first anonymous witness also didn't see Scott make a threat.

"I certainly did not see the guy do anything with a gun that would threaten anybody," the first witness said Sunday. "It appeared to me that if he had guns on him, that they were literally in his pocket or in his waist."

The first witness also was interviewed by homicide detectives about the shooting.

Amesbury said he did not see the man get shot, but, "When I go around the corner, I see this guy laid out. I didn't see a gun." Amesbury's view of the shooting was blocked by stone pillars. He was not interviewed by police.

Before the shooting, Scott was walking with a woman that three witnesses thought was his girlfriend. They said she became distraught after the shooting. The incident also left the witnesses shaken.

It's just incredible "with all these people around that Metro would provoke something there," the second witness said. "I don't want to second-guess the police, but wouldn't it have been better to confront him out at his car?"

After the shooting, some people in the crowd panicked. An elderly woman was knocked down and cut her elbow in the chaos, the second witness said.

Only Scott was struck by gunfire .

Police said Scott had two handguns on him when he was shot. Goodman said Scott had a concealed-weapons permit.

Pusateri said his friend was a "safety freak" around guns. He said that "absolutely not in a million years" would Scott be careless with them around others.

Scott graduated from West Point, in New York, in 1994 and was stationed for a time at Fort Hood, Texas, as a tank platoon leader. In 2003, he graduated from Duke University in North Carolina with a master's degree in

business administration.

Friends said they noticed nothing strange about Scott in the days before the shooting.

On Friday, Scott's vehicle was struck by another vehicle while he was rushing a pacemaker to Summerlin Hospital Medical Center, Pusateri said. Scott was not injured in the collision, and a firefighter took the device from the crash scene to the hospital, he said.

Friends were distraught and puzzled as to why police shot and killed Scott.

"He's a stand-up guy in the community," Goodman said. "This guy is not somebody to put himself in a situation like that."

Pusateri, who also sells medical devices, said Scott worked closely with patients in his job. He called Scott's job the "pinnacle" of the business.

"It's very, very sad," Pusateri said. "I'm shocked by it. It's the tragic loss of a great man."

```
**************************************************
32. How the McDonald decision shows that activism works
**************************************************
```

James Durso emailed me this:

--

From: hotair.com:http://tinyurl.com/36ygokm

[SNIP]
Glenn Reynolds takes note of the significant shift in judicial and popular thought on gun control over the last 30 years, ending with the McDonald decision that made clear the individual right of Americans to keep and bear arms, in a Washington Examiner column over the weekend. Glenn emphasizes that this shows how much impact the Tea Party can have if it maintains its efforts in the long run, reversing a seemingly-unstoppable tide of government bloat and intrusion, but the transformation is worthy of note even without that context:

```
**************************************************
33. Why liberals should love the Second Amendment
**************************************************
```

Gary O'Brien emailed me this:

--

From: www.dailykos.com:    http://tinyurl.com/27b2vrc


Why liberals should love the Second Amendment
by Kaili Joy Gray aka Angry Mouse
Sun Jul 04, 2010 at 10:00:03 AM PDT

Liberals love the Constitution.

Ask anyone on the street. They'll tell you the American Civil Liberties Union (ACLU) is a liberal organization. During the dark days of the Bush Administration, membership doubled because so many Americans feared increasing restrictions on their civil liberties. If you were to ask liberals to list their top five complaints about the Bush Administration, and they would invariably say the words "shredding" and "Constitution" in the same sentence. They might also add "Fourth Amendment" and "due process." It's possible they'll talk about "free

speech zones" and "habeus corpus."

There's a good chance they will mention, probably in combination with several FCC-prohibited adjectives, former Attorney Generals John Ashcroft and Alberto Gonzales.

And while liberals certainly do not argue for lawlessness, and will acknowledge the necessity of certain restrictions, it is generally understood that liberals fight to broadly interpret and expand our rights and to question the necessity and wisdom of any restrictions of them.

Liberals can quote legal precedent, news reports, and exhaustive studies. They can talk about the intentions of the Founders. They can argue at length against the tyranny of the government. And they will, almost without exception, conclude the necessity of respecting, and not restricting, civil liberties.

Except for one: the right to keep and bear arms.

When it comes to discussing the Second Amendment, liberals check rational thought at the door. They dismiss approximately 40% of American households that own one or more guns, and those who fight to protect the Second Amendment, as "gun nuts." They argue for greater restrictions. And they pursue these policies at the risk of alienating voters who might otherwise vote for Democrats.

And they do so in a way that is wholly inconsistent with their approach to all of our other civil liberties.

Those who fight against Second Amendment rights cite statistics about gun violence, as if such numbers are evidence enough that our rights should be restricted. But Chicago and Washington DC, the two cities from which came the most recent Supreme Court decisions on Second Amendment rights, had some of the most restrictive laws in the nation, and also some of the highest rates of violent crime. Clearly, such restrictions do not correlate with preventing crime.

So rather than continuing to fight for greater restrictions on Second Amendment rights, it is time for liberals to defend Second Amendment rights as vigorously as they fight to protect all of our other rights. Because it is by fighting to protect each right that we protect all rights.

And this is why:

(Reasons below the fold)

::
No. 1:  The Bill of Rights protects individual rights.

If you've read the Bill of Rights -- and who among us hasn't? -- you will notice a phrase that appears in nearly all of them:  "the people."

First Amendment:

...the right of the people peaceably to assemble

Second Amendment:

A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed.

Fourth Amendment:

The right of the people to be secure in their persons, houses, papers, and effects...

Ninth Amendment:

...shall not be construed to deny or disparage others retained by the people

Tenth Amendment:

...are reserved to the states respectively, or to the people.

Certainly, no good liberal would argue that any of these rights are collective rights, and not individual rights. We believe that the First Amendment is an individual right to criticize our government.

We would not condone a state-regulated news organization. We certainly would not condone state regulation of religion. We talk about "separation of church and state," although there is no mention of "separation of church and state" in the First Amendment.

But we know what they meant. The anti-Federalists refused to ratify the Constitution without a Bill of Rights; they intended for our rights to be interpreted expansively.

We believe the Founders intended for us to be able to say damn near anything we want, protest damn near anything we want, print damn near anything we want, and believe damn near anything we want. Individually, without the interference or regulation of government.

And yet, despite the recent Heller and McDonald decisions, liberals stumble at the idea of the Second Amendment as an individual right. They take the position that the Founders intended an entirely different meaning by the phrase "the right of the people" in the Second Amendment, even though they are so positively clear about what that phrase means in the First Amendment.

If we can agree that the First Amendment protects not only powerful organizations such as the New York Times or MSNBC, but also the individual commenter on the internet, the individual at the anti-war rally, the individual driving the car with the "Fuck Bush" bumper sticker, can we not also agree that the Second Amendment's use of "the people" has the same meaning?

But it's different! The Second Amendment is talking about the militia! If you want to "bear arms," join the National Guard!

Right?

Wrong.

The United States Militia Code:

(a) The militia of the United States consists of all able-bodied males at least 17 years of age and, except as provided in section 313 of title 32, under 45 years of age who are, or who have made a declaration of intention to become, citizens of the United States and of female citizens of the United States who are members of the National Guard.

(b) The classes of the militia are--
(1) the organized militia, which consists of the National Guard and the Naval Militia; and
(2) the unorganized militia, which consists of the members of the militia who are not members of the National Guard or the Naval Militia.

Aside from the fact that the National Guard did not exist in the 1700s, the term "militia" does not mean "National Guard," even today. The code clearly states that two classes comprise the militia: the National Guard and Naval Militia, and everyone else.

Everyone else. Individuals. The People.

The Founders well understood that the militia is the people, for it was not only the right but the obligation of all citizens to protect and preserve their liberty and to defend themselves from the tyranny of the government.

And fighting against the tyranny of the government is certainly a liberal value.

No. 2: We oppose restrictions to our civil liberties.

All of our rights, even the ones enumerated in the Bill of Rights, are restricted. You can't shout "Fire!" in a crowd. You can't threaten to kill the president. You can't publish someone else's words as your own. We have copyright laws and libel laws and slander laws. We have the FCC to regulate our radio and television content. We have plenty of restrictions on our First Amendment rights.

But we don't like them. We fight them. Any card-carrying member of the ACLU will tell you that while we might agree that certain restrictions are reasonable, we keep a close eye whenever anyone in government gets an itch to pass a new law that restricts our First Amendment rights. Or our Fourth. Or our Fifth, Sixth, or Eighth.

We complain about free speech zones. The whole country is supposed to be a free speech zone, after all. It says so right in the First Amendment.

But when it comes further restrictions on the manufacture, sale, or possession of firearms, liberals are not even silent; they are vociferously in favor of such restrictions.

Suddenly, overly broad restrictions are "reasonable." The Chicago and Washington D.C. bans on handguns -- all handguns -- is reasonable, even though the Supreme Court has now said otherwise.

Would we tolerate such a sweeping regulation of, say, the Thirteenth Amendment?

Neither slavery nor involuntary servitude, except as a punishment for crime where of the party shall have been duly convicted, shall exist within the United States, or any place subject to their jurisdiction.

What if a member of Congress -- say, a Republican from a red state in the south -- were to introduce a bill that permits enslaving black women? Would we consider that reasonable? It's not like the law would enslave all people, or even all black people. Just the women. There's no mention of enslaving women in the Thirteenth Amendment. Clearly, when Lincoln wanted to free the slaves, he didn't intend to free all the slaves. And we restrict all the other Amendments, so obviously the Thirteenth Amendment is not supposed to be absolute. What's the big deal?

Except that such an argument is ridiculous, of course. Liberals would take to the streets, send angry letters to their representatives in Washington, organize marches, call progressive radio programs to quote, verbatim, the Thirteenth Amendment. Quite bluntly, although not literally, liberals would be up in arms.

And yet...A ban on all handguns seems reasonable to many liberals. Never mind that of 192 million firearms in America, 65 million -- about one third -- are handguns.

Such a narrow interpretation of this particular right is inconsistent with the otherwise broad interpretation of the Bill of Rights. And just as conservatives weaken their own arguments about protecting the Second Amendment when they will not fight as vigilantly for protecting all the others, so too do liberals weaken their arguments for civil liberties, when they pick and choose which civil liberties they deem worthy of defense.

No. 3:  It doesn't matter that it's not 1776 anymore.

When the Founders drafted the Bill of Rights, they could not have imagined machine guns. Or armor-piercing bullets (which are not available to the public anyway, and are actually less lethal than conventional ammunition). Or handguns that hold 18 rounds. A drive-by shooting, back in 1776, would have been a guy on a horse with a musket.

Of course, they couldn't have imagined the internet, either. Or 24-hour cable news networks. Or talk radio. When they drafted the First Amendment, did they really mean to protect the rights of Bill O'Reilly to make incredibly stupid, and frequently inaccurate, statements for an entire hour, five nights a week?

Actually, yes. They did. Bill O'Reilly bilious ravings, and Keith Olbermann's Special Comments, and the insipid chatter of the entire cast of the Today show are, and were intended to be, protected by the First Amendment.

Liberals are supposed to understand that just because we don't agree with something doesn't mean it is not protected. At least when it comes to the First Amendment. And one's personal dislike of guns should be no better a reason for fighting against the Second Amendment than should one's personal dislike of Bill O'Reilly justify fighting against the First Amendment.

And yet, when discussing the Second Amendment, liberals become obtuse in their literalism. The Second Amendment does not protect the right to own all guns. Or all ammunition. It doesn't protect the right of the people as individuals.

Liberals will defend the right of Cindy Sheehan to wear an anti-war T-shirt, even though the First Amendment says nothing about T-shirts.

They will defend the rights of alleged terrorists to a public trial, even though the Founders certainly could not have imagined a world in which terrorists would plot to blow up building with airplanes.

But we do not quibble about the methods by which we practice our First Amendment rights because methodology is not the point. Red herring arguments about types of ammunition or magazine capacity or handguns versus rifles are just that -- red herrings. They distract us from the underlying purpose of that right -- to ensure a free society that can hold its government accountable. The Second Amendment is no more about guns than the First Amendment is about quill pens.

No. 4: It doesn't matter if you can use it.

Fine, you say. Have your big, scary guns. It's not like you actually stand a chance in fighting against the United States government. The Army has bigger, badder weapons than any private citizen. Your most deadly gun is no match for their tanks, their helicopters, their atom bombs. Maybe two hundred years ago, citizens stood a chance in a fight against government, but not today. The Second Amendment is obsolete.

Tell that to the Iraqi "insurgents" who are putting up a pretty good fight against our military might with fairly primitive weapons.

The Second Amendment is obsolete?

What other rights might be considered obsolete in today's day and age?

No Soldier shall, in time of peace be quartered in any house, without the consent of the Owner, nor in time of war, but in a manner to be prescribed by law.

When was the last time a soldier showed up at your door and said, "I'll be staying with you for the indefinite future"?

It's probably been a while. But of course, were it to happen, you'd dust off your Third Amendment and say, "I don't think so, pal."

And you'd be right.

What about the Twenty-Sixth Amendment? How much use does that get?

The right of citizens of the United States, who are eighteen years of age or older, to vote shall not be denied or abridged by the United States or by any State on account of age.

We all know the youth vote is typically pretty abysmal. Those lazy kids can barely get out of bed before noon, let alone get themselves to the voting booth. If they're not going to use their Twenty-Sixth Amendment rights, shouldn't we just delete the damn thing altogether?

Hell no. And this is why liberals work so hard to get out and rock the vote -- to encourage citizens to exercise their rights. That is our obligation as citizens, to protect against the government infringing upon our rights by making full use of them.

And yet, when it comes to the Second Amendment, liberals do not fight to protect that right. Instead them demand more laws. Regulate, regulate, regulate -- until the Second Amendment is nearly regulated out of existence because no one needs to have a gun anyway.

And that, sadly, is the biggest mistake of all.

No. 5: The Second Amendment is about revolution.

In no other country, at no other time, has such a right existed. It is not the right to hunt. It is not the right to shoot at soda cans in an empty field. It is not even the right to shoot at a home invader in the middle of the night.

It is the right of revolution.

Let me say that again:  It is the right of revolution.

Whenever any form of government becomes destructive of these ends life, liberty, and the pursuit of happiness it is the right of the people to alter or abolish it, and to institute new government.

To alter or abolish the government. These are not mild words; they are powerful. They are revolutionary.

The Founders might never have imagined automatic weapons. But they probably also never imagined a total ban on handguns either.

We talk about the First Amendment as a unique and revolutionary concept -- that we have the right to criticize our government. Does it matter whether we do so while standing on a soapbox on the corner of the street or on a blog? No. Because the concept, not the methodology, is what matters.

And the Second Amendment is no different. It is not about how much ammunition is "excessive" or what types of guns are and are not permissible. Liberals cling to such minutia at the expense of understanding and appreciating the larger concept that underlies this right.

So.

What is the point? Is this a rallying cry for liberals to rush right out and purchase a gun? Absolutely not. Guns are dangerous when used by people who are not trained to use them, just as cars are dangerous when driven by people who have not been taught how to drive.

No, this is a rallying cry for the Bill of Rights -- for all of our rights.

This is an appeal to every liberal who says, "I just don't like guns."

This is an appeal to every liberal who says, "No one needs that much ammunition."

This is an appeal to every liberal who says, "That's not what the Founders meant."

This is an appeal to every liberal who supports the ACLU.

This is an appeal to every liberal who has complained about the Bush Administration's trading of our civil liberties for the illusion of greater security. (I believe I've seen a T-shirt or two about Benjamin Franklin's thoughts on that.)

This is an appeal to every liberal who believes in fighting against the abuses of government, against the infringement of our civil liberties, and for the greater expansion of our rights.

This is an appeal to every liberal who never wants to lose another election to Republicans because they have successfully persuaded the voters that Democrats will not protect their Second Amendment rights.

This is an appeal to liberals, not merely to tolerate the Second Amendment, but to embrace it. To love it and

defend it and guard it as carefully as you do all the others.

Because we are liberals. And fighting for our rights -- for all of our rights, for all people -- is what we do.

Because we are revolutionaries.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
34. Tell me again how taking away all our guns would make us safe
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Yet another (yawn) STABBING rampage in China.  I dedicate this to those who think that taking away all our guns will make us all safe:

From: www.timesdispatch.com:   http://tinyurl.com/2aoeq2k

5 killed in China knife attack
By ASSOCIATED PRESS
Published: July 06, 2010

BEIJING -- A village head and four of his family members were killed in China's latest stabbing rampage, state media reported today. Among the victims was a 5-month-old baby.  [PVC:  To the antis out there - do you still think you can talk a man who is willing to murder a 5-month-old baby out of killing YOU?]

The suspect, who surrendered after police fired warning shots, told authorities he had spent months planning Sunday night's attack on Wang Chengguo, an acting village chief in the central province of Henan, said Xinhua News Agency.

The suspect, Wang Haiyin, blamed a dispute over land and frustration with his mother's government-funded pension.

The 56-year-old village chief's baby granddaughter was among the dead. His 6-year-old grandson was seriously wounded.

Stabbing rampages have made headlines over and over this year in China, especially at schools.

Experts have said at the root of the problem is widespread frustration over the growing wealth gap and corruption, as well as too few legal channels for people who have grievances.

In the space of two months, the country saw five major assaults against schoolchildren, leaving 17 dead and more than 50 wounded.

In another well-known case, a man burst into a court office in central China and fatally shot three judges.

Official statistics say violent crime in China jumped 10 percent last year, with 5.3 million reported cases of homicide, robbery, and rape. It was the first time since 2001 that violent crime increased, said the Chinese Academy of Social Sciences in a February report.

This year's budget includes sharp spending increases for public security.

Posted by ClintK in Alerts at 01:08 | Comments (0) | Trackbacks (0)

# TRACKBACKS

Trackback specific URI for this entry

No Trackbacks

# COMMENTS

Display comments as (Linear | Threaded)

No comments

Powered by s9y – Template by Bulletproof development team – Adapted by Sailorcurt.
All content © 2008 Virginia Citizens Defense League, Inc

☒ Based on the

☒ Site Meter

VCDL Home   Blog Home   About   Contact   Join VCDL

# EXHIBIT 3

# EXHIBIT 3

*-APPLICATION-*

## Title

**Title of Work:** Slaying of Army veteran shocks friends. Man shot by police was West Point grad.

## Completion/Publication

**Year of Completion:** 2010

**Date of 1st Publication:** July 12, 2010          **Nation of 1st Publication:** United States

## Author

■          **Author:** Stephens Media LLC

**Author Created:** text

**Work made for hire:** Yes

**Citizen of:** United States          **Domiciled in:** United States

## Copyright claimant

**Copyright Claimant:** Righthaven LLC

9960 West Cheyenne Avenue, Suite 210, Las Vegas, NV, 89129-7701, United States

**Transfer Statement:** By written agreement

## Rights and Permissions

**Organization Name:** Righthaven LLC

**Name:** Chief Executive Officer

**Email:** sgibson@righthaven.com          **Telephone:** 702-527-5900

**Address:** 9960 West Cheyenne Avenue

Suite 210

Las Vegas, NV  89129-7701  United States

## Certification

**Name:**  Steven A. Gibson

**Date:**  September 9, 2010

**Applicant's Tracking Number:**  0001998

**Registration #:**

**Service Request #:**   1-484454258

**Application Date:**   09-09-2010 21:14:24

## Correspondent ────────────────────────

**Organization Name:**   Righthaven LLC

**Name:**   Steven A. Gibson

**Address:**   9960 West Cheyenne Avenue
Suite 210
Las Vegas, NV 89129-7701 United States

## Mail Certificate ────────────────────────

Righthaven LLC
Steven A. Gibson
9960 West Cheyenne Avenue
Suite 210
Las Vegas, NV 89129-7701  United States